IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

HERBERT JONATHAN CASTILLO
JUAREZ and PAOLA VALENZUELA
AREVALO,

Defendants.

CRIMINAL ACTION NO.

1:16-CR-341-MHC-CMS

## ORDER AND FINAL REPORT AND RECOMMENDATION

This criminal case is before the Court on several motions filed by two of the defendants, Herbert Jonathan Castillo Juarez ("Castillo") and Paola Valenzuela Arevalo ("Valenzuela"), a married couple.

On September 21, 2016, a grand jury sitting in the Northern District of Georgia returned an eight-count indictment against Castillo, Valenzuela, and others alleging heroin-related crimes, including conspiracy to import heroin from Guatemala. [Doc. 12]. Thereafter, the indictment was superseded twice. [Docs. 49, 93].[1]   In the second superseding indictment, Castillo and Valenzuela

---

[1] In addition to Castillo and Valenzuela, five other individuals have been charged in this case, and four have since pled guilty. Clifford Waldthausen pled guilty on December 19, 2016 [Docs. 72, 77]; Luis Sarti-Gomez pled guilty on January 5, 2017 [Docs. 80, 82]; Angel Bojorquez-Amaya pled guilty on January

(collectively, "Defendants") are charged in each count.  Specifically, they are charged with being part of a nine-year-long conspiracy to possess with intent to distribute heroin (Count One) and a conspiracy to import heroin from Guatemala (Count Two).  [Doc. 93].  They are also charged with importing heroin and possessing heroin with intent to distribute on three dates during the summer of 2016 (Counts Three through Eight).  [Id.].

Defendants have filed motions to suppress statements and evidence related to their arrest in Switzerland [Docs. 175, 176, 183] and motions to suppress photograph identification testimony.  [Docs. 187, 223].   I will address these motions in turn.

## I.   <u>Motions to Suppress Statements and Evidence Regarding Events that Occurred in Switzerland</u>  [Docs. 175, 176, 183]

### A. *Background*[2]

In August 2016, United States Homeland Security ("HSI") suspected that Defendants were involved in a conspiracy to send people from Guatemala to the

---

31, 2017 [Docs. 86, 88]; and Franco Teza-Mendez pled guilty on June 6, 2017. [Doc. 138].  Alden Lougee's case is still pending.

[2] The background facts recited herein have been taken from the Government's response brief, from Castillo's reply brief, and from two documents attached to Valenzuela's supplemental brief.  [Doc. 272 at 2–3; Doc. 288 at 1–2; Doc. 188-1; Doc. 188-2].  These facts appear to be undisputed.

United States with heroin in their luggage or inside their bodies.  Castillo had been identified by a person who had traveled from Guatemala to Atlanta and been discovered with heroin-filled pellets inside his body.  At the direction of U.S. law enforcement agents, the swallower had corresponded with Castillo and learned that Defendants would be traveling by plane from Mexico City, Mexico to Zurich, Switzerland in mid-August 2016 for the purpose of transporting illegal drugs.

On August 18, 2016, HSI Special Agent Lorenzo D'Andrea sent an email to the Swiss federal police alerting them to the fact that Defendants would be arriving later that day at the Zurich airport and that Defendants might be carrying cocaine, either in luggage or inside their bodies.  Special Agent Lorenzo stated: "HSI Attache Rome respectfully request to have [Castillo and Valenzuela] and their personal property examined for narcotics." [Doc. 188-1 at 2].

As scheduled, Defendants arrived in Zurich on August 18, 2016, at which point Zurich Cantonal Police determined that Defendants were carrying narcotics inside their bodies, based on both field interviews and body scans.[3]  The Swiss

---

[3] The arrest does not appear to have resulted from the HSI tip.  When Special Agent D'Andrea followed up on his email, he learned that his email had not reached its destination because it had gone into a SPAM filter and that the Swiss federal police did not know what had happened with Defendants at the Zurich airport.

officials advised HSI that Castillo and Valenzuela each later passed approximately fifty capsules filled with cocaine.  Defendants were arrested by Swiss law enforcement and were charged with attempted trafficking of cocaine.

One month later, on September 21, 2016, Defendants were indicted in federal court in Atlanta, Georgia.  At that time, Defendants were still in Swiss custody.  [Doc. 12].

Defendants were convicted in the Swiss courts of drug offenses and served criminal sentences.  After completing their sentences in Switzerland, Defendants were extradited to the United States.  On June 21, 2017, the United States Marshal Service took custody of Defendants from the Swiss authorities, along with the electronic devices that were seized from Defendants when they were originally arrested.  Upon arriving in the United States, HSI agents searched the devices (pursuant to a warrant) and sent a request for information to the Swiss authorities pursuant to the Treaty on Mutual Legal Assistance in Criminal Matters ("MLAT").  Several months later, the Swiss authorities provided the U.S. authorities with information concerning Defendants, including certain statements that Defendants made to Swiss authorities.  According to the Government, U.S. law enforcement agents were not involved in obtaining the statements and did not know of their existence until Switzerland provided the MLAT response.  The Government states

4

that the MLAT information reflects that each statement was made in the presence of Defendants' Swiss defense counsel.

In their motions to suppress evidence and statements, Defendants argue that their arrests violated the Fourth Amendment of the U.S. Constitution, and therefore any statements made while they were in custody and any items seized at the time of their arrests—including their electronic devices—should be excluded as "fruit of the poisonous tree." [Doc. 175 at 3; Doc. 176 at 2; Doc. 183 at 2–4]. Valenzuela also argues that any statements she may have made in Switzerland should be suppressed because the statements were not freely and voluntarily made and because she did not knowingly or voluntarily waive her <u>Miranda</u> rights. [Doc. 175 at 2–3].[4]

In response, the Government argues that Defendants' motion should be denied for several independent reasons. According to the Government, Defendants lack standing to make any Fourth Amendment challenge to the admission of any evidence obtained in connection with their arrest in Switzerland because they are Guatemalan nationals who were searched on foreign soil. [Doc. 272 at 3–4]. The

---

[4] In his motion to suppress, Castillo challenges only those statements made without the assistance of counsel. [Doc. 183 at 1, 3]. The Government states in its reply and surreply that it is not aware of any such statements and that the only statements of which it is aware are those made in the presence of and with the assistance of counsel. [Doc. 272 at 13 n.3; Doc. 290 at 4 n.1].

Government also argues that the Fourth Amendment does not apply because Swiss authorities (rather than U.S. authorities) made the arrests, obtained the statements, and seized the items. [Id. at 5–9]. With respect to Valenzuela's argument about the voluntariness of her statements, the Government argues that each statement at issue was made in the presence of counsel and that prior to each interview, Swiss officials advised Defendants of their rights under Swiss law, giving them substantially similar admonitions as ones received under Miranda. [Id. at 13]. The Government argues further that that even if counsel had not been present, the statements would still be admissible because Miranda warnings are not required unless there was a joint venture between the law enforcement officers in Switzerland and the United States, and in this case, there was no such joint venture. [Id. at 10–13].

In reply, Defendants argue that because HSI agents sent the email to the Swiss federal police requesting that Defendants be examined for narcotics, there was a joint venture between the two countries and, alternatively, that introduction of this evidence "shocks the judicial conscience." [Doc. 287 at 2–4]. Valenzuela also urges the Court to hold a Jackson v. Denno hearing to determine whether her statements were voluntary. [Id. at 5–7].

6

B. *Legal Standard*

With respect to standing, the Supreme Court has held that the Fourth Amendment does not apply to searches conducted outside the United States where the person searched does not have a previous significant voluntary connection to the United States. United States v. Verdugo-Urquidez, 494 U.S. 259, 272–73, 275 (1990). The Supreme Court reasoned that because the Fourth Amendment is expressly limited to "the people," it refers only "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" and that the Fourth Amendment was not designed to restrain the actions of the federal government against aliens outside of the United States territory. Id. at 265–66, 272–73.

Moreover, it is well settled that the Fourth Amendment exclusionary rule does not apply to searches and seizures conducted by foreign officials in a foreign country:

> The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the foreign country. But this Circuit has recognized two narrow exceptions to this rule. The first exception is that evidence from foreign searches is inadmissible if the conduct of the foreign officials during the search shocks the judicial conscience. This exception is based on a federal court's inherent supervisory powers over the administration of federal justice. The second exception is that evidence from foreign searches is subject to the

> exclusionary rule if American law enforcement officials substantially participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counterparts.

United States v. Emmanuel, 565 F.3d 1324, 1330 (11th Cir. 2009) (internal citations and quotation marks omitted).  Similarly, statements obtained by foreign officers conducting interrogations in their own nations are admissible despite a failure to give Miranda warnings to the accused, unless one of the two exceptions noted above applies.  See United States v. Heller, 625 F.2d 594, 599 (5th Cir. 1980).

*C. Discussion*

Here, the facts of this case fall squarely within the caselaw cited above. Defendants have not disputed that at the time of their arrests, they were both citizens and residents of Guatemala, and they have presented no evidence that they had any voluntary attachment to the United States.  As such, they do not have standing to assert a constitutional challenge to the admission of this evidence.  See Verdugo-Urquidez, 494 U.S. at 274–75; Emmanuel, 565 F.3d at 1330–31.

Further, even if Defendants had standing to assert a constitutional challenge to the evidence acquired by the Swiss authorities, such a claim fails in this case because all the actions about which Defendants complain—being arrested, having their property seized, and being interviewed by law enforcement—were taken by

Swiss law enforcement officers in Switzerland.  Under these circumstances, the Fourth Amendment has no application. United States v. Morrow, 537 F.2d 120, 139 (5th Cir. 1976) ("As a starting point, the fourth amendment exclusionary rule does not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law, even if the persons arrested and from whom the evidence is seized are American citizens.").

Finally, I find meritless Defendants' arguments that one or both exceptions to the general rule apply.  First, there is nothing shocking about Swiss officials arresting narcotics traffickers carrying cocaine in their bodies or about U.S. law enforcement officials sending an email to their Swiss counterparts alerting them to suspected drug carriers.  Nor is there anything shocking about asking the Swiss authorities to do what is a standard routine practice, *i.e.*, examine people in the airport for narcotics.  And second, Defendants have made no showing that the U.S. authorities either "substantially participated" in the arrest-related activities in Switzerland or that the Swiss authorities were "actually acting as agents for their American counterparts."  See Emmanuel, 565 F.3d at 1330.  Valenzuela provides no specifics in her brief, other than to say "[t]he Swiss authorities followed the intelligence and direction of the United States agents." [Doc. 287 at 3].  For his part, Castillo complains only that HSI agents "notified Swiss officials and told the

Swiss that [Defendants] may be smuggling drugs." [Doc. 288 at 2]. Defendants have proffered no facts showing that United States law enforcement officers participated in the arrest of Defendants, in the search of Defendants, in taking Defendants' statements, or in any other activity that would establish a joint venture between the countries. See Heller, 625 F.2d at 599 (finding no joint venture despite the fact that but for a tip from the Americans, the defendant probably would not have been arrested because the counterfeit treasure bills were seized before U.S. agents arrived, the defendant was charged with a violation of British (not American) law, and the British and U.S. agents did not exchange information regarding their separate interrogations of the defendant).

Here, Defendants have failed to alleged facts that, if proved, would require the grant of relief. Their motions are based on merely general and conclusory allegations. As such, no evidentiary hearing on the motions to suppress statements and evidence is required, and the motions should be denied. See United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985); United States v. Davis, 330 F. Supp. 899, 903 (N.D. Ga. 1971).

II.  **Motion to Suppress Testimony of Photo Identifications** [Docs. 187, 223]

On August 28, 2018, I held an evidentiary hearing on Defendants' argument that the Court should suppress photograph-based identifications of them made by four of their codefendants.  The only witness who testified at the hearing was HSI Special Agent James Holt, the case agent.  [Doc. 290 at 13].  Following the hearing, Defendants submitted post-hearing briefs [Docs. 291, 292], and the Government responded to those briefs [Doc. 312].

A. *Evidence Presented at the Evidentiary Hearing*

Special Agent Holt testified that on August 4, 2016, Clifford Waldthausen was arrested at Hartsfield-Jackson International Airport in Atlanta for transporting drugs inside his body. [Doc. 289 at 13, 31].  Waldthausen is one of the co-defendants who has already pled guilty in this case.  Special Agent Holt testified that after Waldthausen admitted to having ingested drugs for transport, he was taken to the hospital where he was interviewed the next day.  [Doc. 289 at 31–32].  Waldthausen advised Special Agent Holt that he was working for a married couple whose names were Paola and Jonathan.  [Id. at 14].  Mr. Waldthausen advised Special Agent Holt that he knew Paola and Jonathan personally, having stayed in their home overnight and having completed six drug trips for them.  [Doc. 289 at 63, 67].  At Special Agent Holt's direction, Waldthausen pulled up the Facebook

accounts for the couple on Waldthausen's phone.  Waldthausen then showed Special Agent Holt the profile pictures for Defendants on the phone.  [Id. at 14, 31].  At the hearing, the Government introduced color printouts of the Facebook profile pictures that Waldthausen showed Special Agent Holt.  [Id. at 14, 18–19; Gov. Ex. 1 (Doc. 285-1); Gov. Ex. 2 (Doc. 285-3)].

Special Agent Holt testified that a week later, he became aware of Luis Sarti-Gomez, another co-defendant who has since pled guilty, who also was arrested at the Atlanta airport for drug trafficking.  [Doc. 289 at 15].  At the time of his arrest, Mr. Sarti-Gomez advised law enforcement that he was working for a boss named Pepe and that Tito and Paola were recruiting couriers.  [Id. at 15–16].  The agent who first responded to the arrest called Special Agent Holt because he thought this arrest was similar to the case that Holt was working on.  [Id.].  Special Agent Holt then interviewed Mr. Sarti-Gomez, who advised that he had met with Paola and Tito "about three or four times" and described Paola as being approximately 40 years old, with long black hair, and "a lot of plastic surgery."  [Id. at 16].  Special Agent Holt met with Mr. Sarti-Gomez and showed him black and white copies of the Facebook profile pictures of Defendants that Holt had reviewed with Waldthausen.  [Id. at 16–17; Gov. Ex. 1a (Doc. 285-2); Gov. Ex. 2a (Doc. 285-4)].  After being shown the pictures, Mr. Sarti-Gomez identified the

people in the photos as the people he was working for, Paola and Tito. [Doc. 289 at 19]. Mr. Sarti-Gomez did so immediately, with no hesitation. [Id. at 68]. Special Agent Holt testified (1) that Mr. Sarti-Gomez then made monitored phone calls to Defendants and sent them text messages; (2) that there were photographs of Mr. Sarti-Gomez on Defendants' phones; and (3) that Sarti-Gomez was the person who provided the information to law enforcement about Defendants' trip to Switzerland. [Doc. 289 at 68–69].

Special Agent Holt testified that he also spoke with a man named Angel Bojorquez-Amaya, another co-defendant in this case who has since pled guilty, at a proffer session in the United States Attorney's Office in July 2016. [Doc. 289 at 20]. At that proffer session, he showed Mr. Bojorquez-Amaya a stack of twenty-five photographs of various people—some male and some female—that Holt suspected were involved in the drug conspiracy. [Id. at 20–21; Gov. Ex. 3.01–3.25 (Doc. 282)[5]]. Contained within the packet were photographs of Defendants that he had obtained from the HSI office in Guatemala; they were official government

---

[5] Because not all the people whose pictures were contained in the packet labeled Government's Exhibit 3, and later in Government Exhibit 4, were identified by the witnesses as being part of the conspiracy, I ordered the entire packets placed under seal. The full packets are located under seal at Docket Entry 282. The photographs that witnesses identified from those two packets are publicly filed at Docket Entry 285.

photographs used for "either their Guatemalan passport or driver's license or something like that." [Doc. 289 at 40].  He testified that when he showed Mr. Bojorquez-Amaya the pictures:

> I told Mr. Bojorquez-Amaya that I have these 25 pictures, you may know some of these people, or you may not some of them, just be honest with me.  I'll show you each picture one at a time and keep in mind that people's appearances can change over time, for instance, you can change your hairstyle, a man can change their facial hair, just to look at the face, and if you know the person, tell me how you know them, and if you don't just tell me you don't know them.

[Doc. 289 at 20–21].  When Bojorquez-Amaya saw the pictures, he immediately identified the picture of Valenzuela as being "Claudia," the woman for whom he was trafficking drugs, and the picture of Castillo as "Claudia's husband who he was also working for."   [Id. at 22, 71–72; Gov. Ex. 3.23 (Doc. 285-5); Gov. Ex. 3.24 (Doc. 285-6)].  During the proffer session, Mr. Bojorquez-Amaya stated that he had met Defendants several times.  He said he spent an evening at a nightclub with Claudia, participated in a meeting with both Claudia and her husband in "an office or empty apartment in Guatemala where they discussed the drug trafficking trip, met them both near a travel agency, and met Claudia at her house on the day he smuggled drugs into the United States.  [Id. at 71].  Additionally, Special Agent

Holt testified that there were photographs of Mr. Bojorquez-Amaya on Defendants' phones.[6]  [Id. at 72].

Special Agent Holt testified that he also spoke with Franco Teza-Mendez, a fourth defendant in this case who has pled guilty, at a proffer session in the United States Attorney's Office in May 2017.  [Doc. 289 at 22–23].  Holt testified that he showed Mr. Teza-Mendez a stack of ten photographs of various people, both men and women.  [Id. at 23–24; Gov. Ex. 4.01–4.10 (Doc. 282)].  Holt testified as follows:

> I explained to Mr. Teza-Mendez that I was going to show him these ten photographs one at a time, and that he may know the people or he may not, just to be honest with me about that.  I also explained how people's appearances can change over time, and then I showed him each picture one at a time.

[Doc. 289 at 23].  Contained within the packet was a photograph of Castillo and one of Valenzuela that he had obtained from the HSI office in Guatemala.  When Teza-Mendez saw the pictures, he immediately identified the picture of Valenzuela as "Licenciada" and stated that he had been introduced to her by Pepe, a man for

---

[6] On cross-examination, Special Agent Holt admitted to having previously testified before the grand jury that Mr. Bojorquez-Amaya told him that he "barely knew" Claudia.  [Doc. 289 at 47–48].  Special Agent Holt later clarified on re-direct, however, that his grand jury testimony occurred six weeks before the proffer session during which Bojorquez-Amaya admitted to being personally familiar with Defendants. [Id. at 69–70].

whom he was trafficking drugs.  [Doc. 289 at 24–25, 73; Gov. Ex. 4.06 (Doc. 285-7)].  Teza-Mendez identified the picture of Castillo as "Jona," who was at an in-person meeting with Pepe and Licenciada.  [Doc. 289 at 25, 73–74; Gov. Ex. 4.07 (Doc. 285-8)].  He expressed no doubt or reservations as to who the people were.  [Doc. 289 at 73–74].  Special Agent Holt testified that a search of Mr. Teza-Mendez's phone revealed text messages with Defendants discussing the Switzerland trip, and information concerning Mr. Teza-Mendez trafficking drugs was also found on Defendants' phones.  [Id.].

The stacks of photos that Special Agent Holt showed to Angel Bojorquez-Amaya (Exhibit 3) and Franco Teza-Mendez (Exhibit 4) depict individuals who all look different from one another.  [Doc. 282].  On cross-examination, Special Agent Holt testified that he never prepared a traditional lineup card with photos of people who resembled Defendants.  He testified that the stacks of photos he showed to Bojorquez-Amaya and Teza-Mendez were not intended to be pictures of people who resemble or share physical features with Defendants.  Rather, they were simply pictures of people who Holt suspected might be part of the conspiracy.  [Doc. 289 at 39–40, 62].

In their post-hearing briefs, Defendants argue that the identification testimony of all four co-defendants (Waldthausen, Sarti-Gomez, Bojorquez-

Amaya, and Franco Teza-Mendez) should be excluded because the procedures used in obtaining that testimony were impermissibly suggestive and the identifications are unreliable.  [Doc. 291].[7]

   B. *Legal Standard*

   Pre-trial identifications may violate a defendant's Constitutional due process rights when "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968); see also Neil v. Biggers, 409 U.S. 188, 198 (1972). "It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." Biggers, 409 U.S. at 198.   When determining the admissibility of a pretrial identification, "reliability is the linchpin." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

   Courts use a two-step analysis to assess the admissibility of a pretrial identification.  United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001).  The

---

   [7] Castillo adopted Valenzuela's post-hearing brief.  [Doc. 292].  For ease of reference, I will cite only to Valenzuela's brief.

first step is to determine whether the identification procedure used was unnecessarily suggestive, and it is the defendant's burden to make this showing. If the Court determines that the procedure was unnecessarily suggestive, the Court must then go on to the second step and determine whether, under the totality of the circumstances, the identification is reliable despite the suggestive nature of the procedure. Id. (citing Biggers, 409 U.S. at 199; Dobbs v. Kemp, 790 F.2d 1499, 1506 (11th Cir. 1986)).

With regard to the first question—whether the identification procedure was unnecessarily suggestive—courts generally look at the number of photographs shown to the witness, the nature of the photographs shown to the witness, and the police officer's conduct when presenting the photographs. As the Supreme Court stated in Simmons, the risk of misidentification is:

> increased if the police display to the witness only the picture of a single individual who generally resembles the person [the witness] saw, or if they show [the witness] the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.

Simmons, 390 U.S. at 383 (internal footnotes omitted). As discussed above, even if the procedure is unnecessarily suggestive, the evidence will not be excluded unless it is also shown to be unreliable. See Manson v. Brathwaite, 432 U.S. 98,

114–16 (1977) (noting that when a procedure is unnecessarily suggestive but the identification is otherwise reliable, the evidence should not be excluded because the defect in the procedure, *i.e.*, the suggestiveness, "goes to weight and not to substance").

And as for the second question—whether an identification is reliable— courts consider the totality of the circumstances, including whether the witness had an opportunity to view the suspect at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the level of certainty demonstrated by the witness at the time of identification, and the length of time between the crime and identification. <u>Biggers</u>, 409 U.S. at 199–200. For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification, and courts consider the totality of the circumstances in making this decision. <u>See</u> <u>id.</u>

   *C.  Discussion*

<u>Waldthausen</u>

As I indicated at the evidentiary hearing, I find Defendants' arguments with respect to Mr. Waldthausen to be frivolous. Defendants cite to caselaw addressing alleged improper use of photographs ***by law enforcement***. [Doc. 291 at 8]. But that law simply does not apply to what transpired with Mr. Waldthausen. It was

19

he—not law enforcement—who selected the photographs.  Waldthausen provided names for the suspects, stated that he was friends with them on Facebook, located the Facebook profile pictures of Defendants on his own phone, and then presented the pictures to Special Agent Holt—not vice versa.  The cases upon which Defendants rely all involved law enforcement selecting persons or photographs of persons to display to witnesses, and Defendants have cited no caselaw to support their argument that the due process concerns addressed in those cases are present where the witness is the person who selects the photograph upon which to make an identification.  Indeed, what Mr. Waldthausen did does not constitute an "identification" within the meaning of those cases.  In the absence of any legal support—or even a compelling argument—to suppress identification testimony by Mr. Waldthausen, I recommend that this portion of Defendants' motion be denied.

### *Sarti-Gomez*

Mr. Sarti-Gomez was shown just a single photograph of each of the Defendants.  [Doc. 289 at 16–17].  Showing a single photograph, rather than a photo array, can be unduly suggestive.  See Simmons, 390 U.S. at 383 (noting that the risk of misidentification is increased if the police show a picture to the witness of only a single individual); United States v. Cueto, 611 F.2d 1056, 1063–64 (5th Cir. 1980) (holding that a procedure was unduly suggestive where witness was

shown one photograph of the defendant); Hudson v. Blackburn, 601 F.2d 785, 788 (5th Cir. 1979) (observing that "a single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion"). I conclude that here, the process used was unduly suggestive. Thus, I must proceed to determine whether the totality of the circumstances establish that the identification was reliable.

I conclude that Mr. Sarti-Gomez's identification of Defendants should not be suppressed because it is reliable and there is no substantial risk of misidentification. The Government has presented compelling evidence that Mr. Sarti-Gomez had extensive, personal contacts with Defendants. Specifically, Special Agent Holt testified that under the direction of law enforcement, Mr. Sarti-Gomez made monitored phone calls to Defendants and sent them text messages; that there were photographs of Mr. Sarti-Gomez in Defendants' phones; and that Mr. Sarti-Gomez was the person who provided the information to law enforcement about Defendants' plan to smuggle drugs into Switzerland—information that turned out to be accurate. [Doc. 289 at 68–69].

Given the totality of these circumstances, it is clear that Mr. Sarti-Gomez could reliably identify Defendants independent of the pre-trial photo identifications. There is no evidence that Sarti-Gomez ever gave a description that

was inconsistent with Defendants or that Special Agent Holt told Mr. Sarti-Gomez that the people depicted in the stack of photographs were involved in any crime. Given the close prior relationship of the witness to Defendants, the photographic identification is, by its very nature, reliable.  See United States v. Omar, 786 F.3d 1104, 1109–10 (8th Cir. 2015) (noting that when someone already familiar with a suspect is asked to comment on whether an image portrays the suspect, concerns about the prejudicial effect of undue suggestiveness are absent); United States v. Carter, No. 205CR67FTM29DNF, 2005 WL 3556050, at *1 (M.D. Fla. Dec. 28, 2005) (concluding that an identification of a defendant from a single photograph by a witness was reliable where the witness, a police officer, had made a hand-to-hand purchase of drugs from defendant on three separate occasions and had previously spoken to the defendant on the telephone).  Accordingly, I recommend that the portion of Defendants' motions addressing the identification made by Mr. Sarti-Gomez be denied.

### *Bojorquez-Amaya and Teza-Mendez*

The Government presented evidence that Special Agent Holt showed Mr. Bojorquez-Amaya a stack of twenty-five photographs and showed Mr. Teza-Mendez a stack of ten photographs of various people who he suspected were involved in the drug conspiracy; some were male and others female, and none

particularly resembled one another.  [Doc. 289 at 20–21, 23–24, 39–40, 62; Gov. Ex. 3.01–3.25 (Doc. 282); Gov. Ex. 4.01–4.10 (Doc. 282)].  He also testified that both Bojorquez-Amaya and Teza-Mendez immediately picked Defendants out of the stack with no hesitation.  [Doc. 289 at 22, 24–25, 71–72; Gov. Ex. 3.23 (Doc. 285-5); Gov. Ex. 3.24 (Doc. 285-6); Gov. Ex. 4.06 (Doc. 285-7); Gov. Ex. 4.07 (Doc. 285-8)].

There was nothing suggestive about the procedure used with either Mr. Bojorquez-Amaya or Mr. Teza-Mendez.  For example, there was no evidence that the photographs of Defendants were emphasized or that either witness had previously been shown a photograph of either Castillo or Valenzuela. The photos of Defendants are not "mug shots."  And there is no evidence that law enforcement guided the witnesses or even suggested that anyone depicted in the stacks had committed a crime.  Defendants have presented no evidence that the agents communicated any information about Defendants to the witnesses with the purpose or effect of influencing their identification. There is also nothing in the record to suggest that any of the photographs of either of the Defendants unfairly suggested that such defendant was involved in criminal activity.  And, according to Special Agent Holt, both witnesses identified the photographs of Defendants quickly, and without hesitation.

Under these circumstances, Defendants have failed to meet their burden of showing that the procedure in which Mr. Bojorquez-Amaya and Mr. Teza-Mendez chose Defendants' photographs was unnecessarily suggestive.  See United States v. Mark, No. 2006-80, 2007 WL 2669570, at *5–6 (D. V.I., Sept. 5, 2007) (concluding that a procedure in which a witness was shown a stack of photos was not unnecessarily suggestive); United States v. Goldsmith, No. 17-CR-2051-LRR, 2018 WL 1410836, at *4 (N.D. Iowa, Mar. 21, 2018) (finding a procedure not impermissibly suggestive where the officers presented a witness with a stack of photos but did not direct the witness's attention to the defendant's photograph); United States. v. Bergdoll, 412 F. Supp. 1323, 1339 (D. Del. 1976) (finding nothing to indicate that a procedure was suggestive where agents handed witnesses a stack of thirty-one photographs of people who had been arrested, agents asked the witnesses whether they could identify any of the individuals, the agents did not draw attention to any particular photograph, and the character of the photographs and the persons depicted therein did not make any particular individual stand out as an obvious choice); United States v. Gaye, No. 14-344(JRT/FLN), 2015 WL 8785745, at *14 (D. Minn. June 11, 2015) (holding the use of a stack of photos and a photobook not suggestive where the witness was asked to identify anyone he recognized and was not told who might be in the photographs).

24

But even if the procedures were unduly suggestive, the witnesses' prior familiarity with Defendants allays any concerns about the admissibility of the identification. See Omar, 786 F.3d at 1109–10; Carter, 2005 WL 3556050, at *1. I agree with the Government that the witnesses' identifications of Defendants are most reliable, and the chance that the witnesses made a mistake as to who the people were who were directing them to import drugs is very slight.  The evidence showed that Bojorquez-Amaya had met Defendants several times, including having spent an evening at a nightclub with Claudia and having participated in a meeting with both Defendants in Guatemala where they discussed a drug trafficking trip.  [Doc. 289 at 71].  And Mr. Teza-Mendez also was personally familiar with Defendants, having attended an in-person meeting with them and having been in telephone communication with them regarding illegal activities. [Doc. 289 at 24–25, 73–74].  Accordingly, I recommend that the portion of Defendants' motions addressing the identification made by Bojorquez-Amaya and Teza-Mendez be denied.

## III.   CONCLUSION

For the reasons stated herein, I **RECOMMEND** that Defendants' motions to suppress statements and evidence related to the stop and subsequent seizure of items in Switzerland [Docs. 175, 176, 183] be **DENIED** and that Defendants'

motions to suppress testimony regarding photo identifications [Docs. 187, 223] be **DENIED**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial.  Accordingly, these Defendants' cases are **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 11th day of January, 2019.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

26